MacIntyre *vs.* The Cotton States Life Insurance Co.

1. The policy of life insurance involved in this case, interpreted by its own terms without aid from extrinsic evidence, imports that premium money not paid up, but retained by the assured as a loan made to him by the company, was to bear interest from the time the premium became due. Each annual premium, as to the full amount thereof, was due at the time fixed by the policy for its payment, and so much of the money as was not then paid remained due for the purpose of bearing interest, and it bore interest during the whole period the assured retained it as a loan, to wit, up to the maturity of the policy.

2. Nothing appears in the extrinsic evidence which requires or justifies a different construction of the policy in reference to the question of interest, from that to which its own terms give rise.

3. A clause in the prospectus of the company saying, " We require interest on one loan paid annually in advance; all other interest paid by dividends," did not import a guaranty by the company that the dividends would be sufficient to pay all other interest, but signified merely that dividends, so far as they might be sufficient, would be received in discharge of interest, save that which was specified as payable in advance.

4. Upon the facts of the case, an alternative prayer in the declaration for a rescission of the contract of insurance for alleged fraud, ought not to be granted, after the lapse of more than fifteen years after the fraud, if any, was committed.

September 16, 1889

Insurance. Interest. Loans. Evidence. Construction. Contracts. Rescission. Fraud. *Laches.* Before Judge GUSTIN. Bibb superior court. May term, 1888.

On October 6th, 1885, A. T. MacIntyre brought suit against the Cotton States Life Insurance Company on an endowment policy of insurance issued to him January 24th, 1870, alleging as follows : During the fifteen years in which the policy had run, he regularly paid the premium thereon and complied with all the obligations imposed upon him by it. By the terms of the policy, ten thousand dollars became due to him on January 24th, 1885, at which time or shortly afterwards a demand was made upon defendant for the same, which it refused to pay. By the charter of the company, it was a mutual insurance company, whose business was to be extended through several other States besides the State of Géorgia, and is governed by the laws regulating mutual insurance in the code of Georgia, and especially by the rule with regard to good faith as to representations and concealments. He was induced to enter into the contract of insurance by one

W. J. Magill, who was the superintendent of agencies for the company and was invested by it with very high authority, and who represented to him, when he objected to giving notes for part of the premiums, that no interest would be charged on premium loans except for one year in advance on each loan, and that the profits arising from the mutual portion of the business would be sufficient to cancel the loans. Magill represented and guaranteed that the business of the company was such as to assure this, and that its business thereafter would be very largely increased. These representations were made to induce plaintiff to take the policy and but for them he would not have taken it. He did not know of their falsity until after the policy had matured, when he was informed by defendant that they were false, that the mutual portion of the business had been abandoned long ago, and that defendant claimed as an offset the full amount of the annual loans with the full amount of the interest thereon, thus reducing plaintiff's claim to about $2,300. Plaintiff had never been informed in the meantime by the company, nor been able to ascertain in any way, that it was not making sufficient profits to reduce and pay off the loans and interest in the way stipulated by Magill. By reason of the fraud so practiced on him, he is entitled to recover from the company ten thousand dollars. Other insurance companies doing business on the same plan would have so reduced the loans by dividends. Had he insured in them, he would have received $7,000.00 on his policy. If he is not entitled to recover $10,000.00, he is at least entitled to have his contract rescinded, and to recover from defendant $5,915.40, which he has paid the company in cash, with interest thereon from the date of each annual payment. It was the duty of defendant, under its charter, to extend and conduct its

business so as to realize the profits mentioned therein as the property of the policy-holders, and which would go in reduction of the claims upon them ; but in a few years after its organization, it practically abandoned business except to receive premiums; and this was a breach of the contract of insurance that entitles him to recover $10,000.00, or in any event, the sum mentioned as that which would be due him upon the rescission of the contract. Attached to the declaration was the policy sued on, the material parts of which are set out in the first part of the opinion.

The defendant pleaded not indebted; and that if indebted at all, it owed plaintiff only $2,343.00, as shown by account stated attached. It claimed that according to the policy it was entitled to receive interest on premium loans, and by deducting said loans and interest, only the sum of $2,343.00 would be left due to plaintiff, and this after allowing him a credit of $567.80 which is the proportion of earnings or dividends made by defendant to which plaintiff is entitled ; and that from the maturity of the policy it has been willing to pay plaintiff what it alleges to be due him, but he has refused to receive it.

On the trial, it was shown that Magill made a number of efforts to induce plaintiff to take the policy; that plaintiff stated that he wanted a policy on the endowment plan for $10,000.00, due in fifteen years; that Magill had several little books and pamphlets which he used in soliciting insurance ; that plaintiff objected to giving notes for part of the premiums, and Magill stated that the company was already doing business enough for the dividends to pay the loans and interest on them ; and that a certain book and leaflet, hereafter referred to, were similar to those used by Magill in inducing the insurance and were found with part of the premium re-

v 82-31

ceipts given by defendant to plaintiff. It was not shown
that plaintiff had ever read the book, but that Magill
read from the book that he had to plaintiff. Plaintiff
is a lawyer, and was in full possession of his faculties
when he took the insurance. Proper demand was made
by plaintiff for the payment of the policy, and he had
paid his cash premiums at the proper time. Magill
represented himself to be the general agent of the com-
pany when he took the policy, having, among other
powers, that of general superintendence and supervision
over local agents. The policy itself provided that it
should not take effect until countersigned by W. J.
Magill, agent at————. Plaintiff was informed after the
maturity of the policy, by defendant's agent at its princi-
pal office, that defendant had abandoned the mutual
part of its business about ten or twelve years before
January, 1885, and that the representations by Magill
were not authorized. This was the first time plaintiff
knew these things. He had paid in all, in cash pre-
miums, $5,915.40 principal. From the documentary
evidence introduced, it appeared that W. J. Magill was
superintendent of agencies for the defendant. A num-
ber of tables issued by defendant were introduced, show-
ing rates of insurance, etc. upon policies of various
kinds, among others, "ordinary endowment table, with
participation in profits, annual premiums," etc. It fur-
ther appeared from this documentary evidence that all
policies were to participate in the profits during life,
and endowment policies during their continuance. As
to dividends, it was stated that division of surplus oc-
curred annually on January 1st of each year succeeding
the second year, and might be applied at the option of
the insured either to a reduction of all cash premiums
or to the reduction of loan or loans when notes were
given, etc. It was further stated that 50 per cent. loans

would be given on premiums, and that "the loan plan is as safe and profitable to the company and as beneficial to the policy-holders as the all cash plan, because the loans bear interest and are perfectly safe, but it is not recommended, as the loan lessens the amount payable to the survivors; . . . . it however enables a man to obtain double as much insurance as the cash plan would permit for the same money." Under the head of interest, it is stated that "we require interest on one loan paid annually in advance, all other interest paid by dividends." Under the head of "premiums, how paid;" appears the statement that when the annual premium amounts to $50.00 or more, a loan will be given for one half the amount, "but on all such loans 7 per cent. interest must be paid every year in advance; a failure to pay the interest in all cases forfeits the policy." In the premium receipts introduced by plaintiff the amount of premium due is stated as follows "For cash part of premium, $368.60; for interest $25.76; cash $394.36; loan for $368.00." These receipts showed charge for interest of precisely the same amount; in some of them the interest charge is stated, "for interest on loans, $25.76." The dividend book of the company was introduced, showing dividends to account of plaintiff for the years from 1872 to 1884 inclusive, except the years 1874 and 1875, amounting to $567.80.

The jury found for plaintiff $3,241.84, the verdict being rendered June 6th, 1888. He moved for a new trial on the following grounds:

(1–5) Verdict contrary to law and evidence.

(6) Error in refusing to charge that, by the terms of the policy, the loans were not to be deducted from the amount of the policy until it matured; the plaintiff was not liable and bound to pay them until that time; the

interest would not be due on the loans in the mean-while.

(7) Error in refusing to charge as follows: The con-dition in the policy requiring the plaintiff to pay the interest on one credit for premiums " annually in ad-vance to the company " is the only obligation binding the plaintiff to pay interest on the loans, and if that condition has been complied with, then the defendant is not entitled to make any deduction of interest on loans.

(8) Refusal to charge as follows (which was requested in case the court refused to charge as just stated, and charged that interest is due on loans): Although under the policy each loan bears interest from the time it was made, yet if the company published a pamphlet con-taining its terms of insurance and put it into the hands of its general agent, Magill, and if he approached MacIntyre to solicit his taking his policy, and seeking to induce him to do so used the said pamphlet (admitted in evidence by consent) containing the following: " As to interest, we require the interest on one loan paid annually in advance; all other interest paid by divi-dends"; and if the company thus represented to plaintiff that the dividends would be set apart as a special fund for the payment of interest on loans and represented that the interest (except that paid each year in advance on one loan) would be paid out of the dividends, and MacIntyre acted on the faith thereof, and there is noth-ing else in the pamphlet which affects said representa-tion, then the defendant is not entitled to deduct the interest on the loans from the face of the policy.

(9) Error in refusing to charge: If, after the policy was taken, defendant gave annually to plaintiff receipts for the amount demanded of him, and in such receipts made the statement showing the amount due for interest,

and if the interest thus charged was only the interest for one year, then the jury is authorized to look to such annual statements and consider the same as facts bearing upon the question whether the company did not itself recognize that no such interest was due or charge able.

(10) Error in refusing to charge: If the agent of defendant, in soliciting plaintiff to take the policy, made any statement or representations as to the existing condition of the company, and if these statements and representations were material and induced the plaintiff to accept a policy in the defendant's company, and if they were false, and plaintiff continued to pay the annual premiums due upon said policy until the expiration of the same and did not know said statements were false until the policy had expired, and had no reason to suspect that they were false and nothing had occurred to put him on inquiry, then plaintiff is entitled to have said contract rescinded and to recover the amount of money he has paid defendant upon it, with interest from the date of payment.

(11) Refusal to charge: Defendant's charter provides for a system of mutual insurance, and that one-tenth of the dividends shall be paid to the stockholders, and nine-tenths to the mutual policy-holders, according to the premium paid respectively by each, and that this should continue in force during the existence of the company, and that the policy-holders have the right to have credited upon their loans the amount of such dividends. Now if, a short time after the plaintiff had accepted a policy under this mutual system, the company suspended the same and ceased to carry on this part of its business, and said suspension was made without notice to plaintiff, then defendant cannot now set off against the policy any loans which would have been

paid by the dividends had this part of the business been carried on.

(12) Refusal to charge: If the company or agent who made the contract of insurance with the plaintiff knew and fully understood, beyond all doubt, that the plaintiff understood the contract in a certain way, and neither the agent nor the company ever undeceived the plaintiff but continued to allow him to pay premiums annually for fifteen years, then you would be authorized to construe the whole contract in the light of all matters that surrounded it, just as the company or the agent knew the plaintiff understood it.

(13) Refusal to charge: Allegations and statements in the pleadings are not evidence. Defendant has filed a plea in which it sets up that $567.00 are all the dividends that plaintiff is entitled to. While plaintiff could use the admission in the plea to show that at least $567.00 in dividends have been collected, if defendant seeks to derive any benefit from this allegation in the plea it is incumbent upon defendant to prove it to the satisfaction of the jury.

(14) Error in charging as follows: The policy in this case means that plaintiff is to pay in cash annually $368.00, and is to take a loan annually for $368.00 more, and upon the loan each year one year's interest is to be paid in cash, and that the balance of the loan, with the balance of the interest on it for each year from the time of the making of the loan, is to be deducted from the policy when it becomes due. That is to say, at the maturity of the policy defendant will owe plaintiff $10,000.00, but from that is to be deducted as a set-off, for each year, $368.00 held by plaintiff as a loan from defendant, and those loans bear interest from the time they were made to the time the policy becomes due, and that interest would be due upon the policy, except

the one year's interest which was to be paid annually in cash.

(15) Error in charging: The contract plainly means, as it stands, what the court has charged you it does mean, and you would not be authorized to go into any parol testimony for the construction of the contract or for any testimony that has been admitted to you, you would not be authorized to go into to aid you in the construction of this contract.

(16) Error in charging: The jury cannot look to the pamphlet or printed card which has been introduced as adding to the contract of insurance any new or additional terms or conditions, nor as contradicting the terms and conditions of the policy issued by defendant to plaintiff.

(17) Error in charging: Under the terms and conditions of the policy, defendant has a right to deduct from the amount of the policy the amount of premiums loaned to plaintiff, and also interest thereon upon each separate loan, and the jury must deduct from the amount of the policy the amount of such loans with interest from the time each loan was made until the maturity of the policy.

(18) Error in charging: The jury cannot look to the testimony as contradicting or varying the terms of the policy.

(19) Error in charging: Although the agent of the company may have represented to the plaintiff that the company was doing sufficient business to pay off the loans from the profits made, plaintiff was not authorized to rely upon such representations if by the use of ordinary diligence he could have found out for himself whether such representations were true or not.

(20) Error in charging: A party cannot ask for a rescission or cancellation of a contract, unless the par-

ties can be put in the same condition they were before the contract was made. You can inquire from the evidence whether you can put the parties in such condition. You can find out by the pleadings and evidence whether there is any manner in which you can put the parties in the same position; unless you can do so, you are not authorized to find a verdict based upon the rescission of the contract. Plaintiff would be put in the same condition, perhaps, by paying the money back to him that defendant had received from him, but he has had from defendant insurance during fifteen years, for which, if defendant is charged with all the money and required to pay it all back, plaintiff will not have paid to the extent of the amount charged for that insurance. In view of it, find out whether there is any verdict you can find that will put the parties back in the same position they were when the contract was made.

(21) Error in charging: If you find on the other branch to rescind the contract, then find such verdict, if you can do so, as would put the parties back in the same position where they were. Your verdict in that event would be the amount of the money paid as premiums with interest, provided by so doing you could leave defendant in the condition that it was in. You cannot find such a verdict, unless you believe it would leave defendant in the same condition that it was in.

(22) Error in ruling out the following testimony of plaintiff: Magill stated further, as a fact, that the business of the company would extend over Alabama, Mississippi, Tennessee, etc., the States named in the charter; that he was then establishing agencies for the company and the work would be pushed and extended as rapidly as possible over all of said territory; and that the mutual part of said business would not only be so rapidly pushed, but would be continuous; and that the

company would keep agents in these States and would push the business.

(23) Error in ruling 'out the following testimony of plaintiff: Magill represented and stated further, at said time, that said policy would be on the mutual plan and only one half of the premiums would have to be paid in cash and one half in notes. I told him I would not give any note or take a policy on any plan that required it, and he then stated that I could pay one half cash on each annual payment, and that there would be a loan each year for the other half, and that I would only have to pay the interest on each of the loans for one year. I agreed to take a policy under these representations, and such was the contract and agreement between us when I took the policy.

(23*a*) Error in ruling out the following testimony of plaintiff: Magill further stated and represented that defendant had already established the business in this State, and with this and the business they would speedily establish in the other States, the dividends and profits accruing on my policy and belonging and coming to me under the mutual plan would at least pay these loans and probably several thousand dollars more.

(24) Error in ruling out the following testimony of plaintiff: Relying upon the undertakings and representations of defendant by its agent, that it had established agencies in a part of said States and would establish agencies in all of them and push the business to the end or maturity of my policy, I felt assured that enough would be made in the way of profits to pay off all of said loans and that I would receive $10,000.00, and perhaps more, and I therefore acted upon these statements and representations of the defendant's agent, and applied for said policy.

(25) Because, after intimating that the testimony set

up in the next two preceding grounds was inadmissible so far as it related to what the company would do, the court refused to allow the interrogatories of plaintiff to be read and to instruct the jury only to consider so much of them as related to representations as to existing facts.

(26) Error in refusing to allow A. T. MacIntyre, Jr., to answer the following question: "What did Magill say to plaintiff as to whether he would be called upon to pay the loan?"

(27) Error in refusing to allow the same witness to prove what Magill said as to the dividends being sufficient to pay not only the loans and interest on them, but a surplus over.

(28) Error in excluding, by the charge on the subject of the construction of the policy, from the attention of the jury a printed leaflet which was used by Magill as a basis for soliciting insurance, and which was admitted in evidence by consent of counsel on both sides.

In connection with the grounds of the motion which related to the charge of the court on the subject of rescission movant presented the affidavit of one of the jurors, who swore that after hearing all the evidence and the charge of the court (except the last part), he reached the conclusion that plaintiff was entitled to rescind the contract of insurance and get back the money he had paid out. However, in the last part of his charge the judge charged that this could not be done unless both parties could be restored to their former condition, and while MacIntyre could be by giving back his money, there was no way by which the company could be restored to their former condition. When this charge was given, deponent felt that he could not find a verdict by which MacIntyre would get back his money.

Deponent further stated that the charge last mentioned controlled all the jury on that point.

The motion was overruled, and plaintiff excepted.

HILL & HARRIS and BACON & RUTHERFORD, for plaintiff.

LANIER & ANDERSON, for defendant.

BLECKLEY, Chief Justice.

According to the terms of the policy, the company insured the life of MacIntyre in January, 1870, for $10,000, payable at the expiration of fifteen years, or at his death in the event of his dying before that period expired. The consideration of the contract was " an annual premium of $736.60, to be paid on the 24th of January in each and every year for fifteen years next succeeding the date of this policy or during its continuance ; which annual premium is to be paid in the manner following : An annual loan of $368, and a cash annual premium of $368.60, to be paid on the 24th day of January." From the sum insured were to be deducted "the balance of the year's premium on this policy, if any, and also all the notes or credits for premiums thereon, and other indebtedness of the insured to this company." Amongst the conditions set out in the instrument was one declaring that "if the premiums due on this policy shall not be paid at the time above mentioned, and the interest on one note or credit for premiums on this policy paid annually in advance to this company or its authorized agents,  .  .  .  .  this policy shall terminate and become void and of no effect."

What is the proper construction of the policy on the question whether the loans bore interest whilst the policy was running to maturity? Did the interest required to be paid in advance upon one loan only include

all the interest that was to accrue upon all the loans? Or did each loan bear, in addition to this paid up interest, lawful interest for each year save one that elapsed after the loan was made?

We have quoted from the document the sole expression touching interest which it contained; and were that expression the only clue to the meaning of the policy, there might be some difficulty in arriving at the conclusion that more interest accrued than was required to be paid in advance. But as the policy made the whole premium for each year due in January, the whole would have been payable then in cash had it not been stipulated that nearly half of each should be payable in a loan. No time was expressed for the loan to become due; but as it was a substitute for cash, it seems to us that it ought to be considered due for the purpose of bearing interest at the time it was made. No doubt it was intended to run on without payment until the policy matured, but to make it the equivalent of cash, it would have to be treated as an investment of that much money producing an income, which income, as no other measure was adopted, could be measured only by the lawful rate of interest, seven per cent. per annum. The contract, on this question as well as on every other, ought to be construed with reference to the nature of the business in which the insurance company was engaged. Its business was to accumulate money, not only for the benefit of its stockholders, but for the redemption of its policies. There can be no presumption that it, or those who dealt with it, contemplated the lending of its assets gratuitously, or for merely friendly accommodation without interest. How could such an institution afford to leave half of its premiums in the hands of its patrons, unemployed and unproductive? Or how could it afford to accept a single year's interest

paid in advance, as compensation for the use of loans spreading over various periods from fifteen years to one year respectively ? It seems to us that such a system of business cannot rationally be supposed to have been adopted, or to have been in the contemplation of either of the parties to this contract. All writings are to receive a reasonable construction, with reference to the nature of the business or subject-matter to which they relate. It would be unreasonable even to the verge of absurdity to hold that a business corporation, such as a bank or an insurance company, intended to loan its funds for years upon years in the regular course of its business transactions without interest or income as compensation to it for the use of them by the borrower. Moreover, under the charter of this company, (acts of 1868, p. 47,) each of the insured was entitled to participate in the profits, by sharing in dividends. The chief, if not the only, capital employed in producing dividends in behalf of the policy-holders, we may assume, was money taken in as premiums from the insured on their respective policies. If some of the insured paid the whole of their premiums in cash, and some paid only half, themselves borrowing from the company the other half, there would be great inequality in allowing dividends to both these classes on equal terms; and the charter contains nothing warranting unequal terms, either with reference to furnishing money with which to produce profits, or in the distribution of dividends.

We cannot escape the conviction that as the whole annual premium upon the policy now in question became due in January of each year the contract really meant that the company was to have for it as a whole, either the cash, so as to use the same itself, or the equivalent of cash, if the insured retained the money for his own use under the name of loans. This equiva-

lence could be arrived at by computing legal interest on the loans, and in no other way. Our conclusion is, that the court below construed the policy rightly, and that unpaid interest on the various loans, as well as their principal, was to be deducted from the ten thousand dollars on final settlement after maturity of the policy. While the general rule, no doubt, is, that interest will not accrue without contract, express or implied, until after default in making payment, yet the usual instances of implied contract for interest enumerated in the books are not exhaustive; but the implication " extends to every case in which the circumstances indicate a manifest intention on the part of the creditor to claim interest, and on the part of the debtor to accede to such a claim." 2 Story on Cont. §1485.

2. The next question is, whether anything appears in the extrinsic evidence which ought to vary or modify the construction of the policy, based upon its terms, at which we have arrived. The extrinsic evidence consists, in part, of a printed circular or prospectus issued by the company, and used by its agent in procuring the application for insurance which was made by MacIntyre, and in pursuance of which the policy issued. Without passing upon the question respecting the use of the prospectus to add to, contradict or vary the policy in its legal effect, (as to which see *Mutual B. L. Ins. Co. vs. Ruse*, 8 *Ga.* 534; Bliss on Life Ins., §§382–3,) we will consider briefly the terms of the prospectus bearing upon the matter of interest on loans, and see whether they are inconsistent with the policy itself, interpreted as we have construed it. Three relevant expressions occur in the prospectus, the first in these words : " The loan plan is as safe and profitable to the company, and as beneficial to the policy-holders, as the all cash plan because the loans bear interest and are

perfectly safe." The second is in these words : " We require interest on one loan paid annually in advance ; all other interest paid by dividends." The third, which follows immediately after the second, is in these words: "When the annual premium amounts to $50 or more, a loan, if desired, will be given for half of the amount (more or less the fraction of a dollar); but on all such loans seven per cent. interest must be paid every year in advance. A failure to pay the interest in all cases forfeits the policy." The last of these clauses, if standing alone, would plainly import not only that the loans bore interest every year, but that all the interest had to be paid in advance; and while the latter requirement is checked by the immediately preceding clause, as well as by the policy, there is nothing in either of the preceding clauses to negative the implication that interest would run during the whole period the loans were outstanding. The first clause states expressly, "the loans bear interest"; and the second, after saying that the interest of one loan must be paid annually in advance, adds : " all other interest paid by dividends." What other interest could be referred to in this clause save legal interest upon the loans from their date to the maturity of the policy, with one annual payment made in advance on each deducted? It is manifest, therefore, that the scheme indicated by the prospectus as to the *accrual* of interest upon loans is the same precisely as that involved by fair implication in the terms of the policy.

The other extrinsic evidence on the subject is the parol testimony set out in the report, and it likewise plainly shows that throughout the negotiations, both parties contemplated that there would be continuously accruing interest upon the loans, the only possible misunderstanding being as to whether that interest, or any of it, would have to be paid by the insured otherwise

than by the application of his share of the contemplated dividends. We may add that nothing to the contrary is intimated or indicated upon the face of the statements furnished annually by the company to the insured by way of call for payment of the cash part of the premium, together with the advance annual payment of interest on one loan according to the terms of the policy. The object of the statement was simply to show each year how much cash was then due from the insured, and for what it was due. There was no occasion to set out accrued interest which would not be payable until the maturity of the policy, and no attempt to show how the account stood between the parties, further than the account for unpaid cash then or shortly to become due and payable. Any inference tending to negative the right of the company to the interest now in controversy, founded on the absence of any such interest from the statement, would be wholly illogical and unwarranted.

3. Having seen that whether we look inside or outside of the policy, or both inside and outside, interest on loans accrued and continued to accrue until the policy matured, the question remains to be considered whether or not the company, in its contract with the insured, warranted or guaranteed that the dividends would or should be sufficient to discharge all the interest not included in the advance payments expressly provided for by the terms of the policy. Several considerations bearing upon this question are to be noticed. In the first place, there is no authority in the charter empowering the company, or authorizing its officers or agents, to make such warranty. Secondly, nothing of the kind appears in the policy, the writing solemnly executed for the purpose of manifesting the contract between the parties, and the undertakings and obligations of the

company assumed as parts of that contract. A stipu-. lation so important as this cannot be supposed to have been left out of the writing, unless done by mistake, and no mistake is alleged and no application made to reform or correct the policy in this particular or any other. Under these circumstances, if such an undertaking on the part of the company was in the contemplation of the parties whilst the negotiations were in progress, as the parol evidence might seem to indicate, it must be assumed now, after the lapse of more than fifteen years; that when the contract was finally closed and its terms reduced to writing, this feature of the preceding negotiations was deliberately abandoned, and constituted no part of the terms of the contract as finally closed.

Thirdly, the clause in the prospectus quoted above, saying, "We require interest on one loan paid annually in advance; all other interest paid by dividends," even had it been inserted in the policy, would not .necessarily import such a warranty or guaranty as is now in question. The more reasonable construction of it would be that such interest might be paid in dividends, and would be so paid if the dividends proved adequate. This would leave the amount of the dividends to the risk of the party who was to be benefited by them, namely, the insured. The charter made them his property, declaring that " nine tenths of the net-profits thus accruing should be placed to the credit of the mutual policy-holders, who shall participate in the mutual profits of the company in proportion to the amount of premium paid respectively, and which may be applied, as desired by the policy-holder, to the reduction of premium, increase of policy, or drawn by him or her in cash, as provided for in the by-laws." Why should the company undertake to guarantee to

any policy-holder that his share of the dividends should be sufficient in amount to keep down unpaid interest on his loans? How could the company give such a guaranty to one policy-holder and not to all? And how to any or all, consistently with business principles or with legal and moral duty, in the conduct of an institution whose declared dividends had to be limited to "net-profits"? (Charter, article 5, §8.) Surely the company had no power or means to produce net-profits up to any arbitrary or conventional amount; and unless it had such power or means, how could it stipulate with any policy-holder that his due share in the dividends should be so much or enough to pay any part of his debt to the company, whether principal or interest? The true meaning of the prospectus, in the clause which we are considering, is and was, that dividends should, so to speak, be a legal tender for all interest except that required to be paid in advance. This no doubt is the meaning which the company attached to it, and which, as we think, those accepting policies issued by the company, should have attached to it. Any other construction would be too literal and narrow for either of the parties or a court to adopt and act upon. Contemplated from a business or legal standpoint, we are unable to discover the slightest reason why the interest which was to accrue upon the loans was to be measured by the dividends rather than by the legal rate of interest prescribed by the law of the State. It appears from the record that dividends to the amount of $567.80 accrued to the plaintiff during the period for which he was insured; and for this sum the company gave him due credit, and the same was deducted on the trial below from the amount of interest with which he was chargeable. To this extent the interest was "paid by dividends," and the only reason

why all the interest was not so paid was, that there were no more dividends, as far as the evidence shows, to be thus applied.

4. Touching the alternative prayer in the declaration for a rescission of the contract on the ground of fraud, we shall be very brief. The fraud complained of is, in substance, that the company's agent represented that the business of the company was of such extent that its profits were sufficient to protect the policy-holders against liability for the loans and all interest thereon, and that the business would be carried into new fields and still further extended. No specific fact as to what the business amounted to appears to have been represented by the agent. He gave no figures, and so far as appears was asked for none, either as to past or prospective business. If the plaintiff had intended to make these statements—the agent's representations—the basis of his action, in contracting with the company, due care on his part would have required that he should have inquired into details and ascertained how much business the company was doing, what its net-profits amounted to, and what assurance the agent had that there would be an increase of business, etc., etc. If this care was exercised, and reports or statements emanating from the company were exhibited, read and relied upon, it should be shown what these reports or statements contained, and in what respect they were untrue. After the plaintiff had stood upon the contract as delivered to him in writing, for fifteen years or more, in which writing none of these representations appeared, it is certainly too late for him to call upon a court to rescind the contract in his behalf, more especially where he has not yet made for himself any absolute election to rescind it, but has founded his suit in part upon the contract as good and

valid, and only claims a rescission in the event that his construction of it is not correct. He certainly had the means of discovering, long before the fifteen years elapsed, whether the company was really doing the business which the agent represented it was doing, and whether the extension and increase of which the agent spoke had been realized. So far as appears, he made no inquiry upon the subject, and entered into no investigation until after the company had carried the risk for the full term, and had thus fully and completely performed its undertaking so far as risk of life was concerned. In view of all the facts in the record, we think the charge of the court upon this branch of the case—namely, that there could be no rescission unless the jury could discover some way of restoring the parties to their original situation,—was as favorable to the plaintiff as the law would warrant.

Had application been made in due time for rescission, the case would have been a weak one, inasmuch as a large part of the agent's representations must have been matter of opinion only, and inasmuch as the residue consisted of generalities, with no specification as to details and particular facts; but the application being only in the alternative, and coming at so late a day, it is still weaker, and so much out of time and manner, that it appears to us to merit little or no consideration. In *Cotton States Life Ins. Co. vs. Carter*, 65 *Ga.* 228, there were no such obstacles to a rescission as those which the present case presents.

We have thus dealt with the topics appertaining to the controversy which were discussed in argument, and we think our treatment of them has been sufficiently comprehensive to take in the substance of all the material points and questions presented by the motion for a new trial. Without dealing with each of these sepa-

rately, we consider them all as virtually disposed of by what we have ruled. The court committed no error in refusing a new trial.

Judgment affirmed.